**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARTIN CROWSON,

    Plaintiff - Appellee,

v.

WASHINGTON COUNTY STATE OF
UTAH; CORY PULSIPHER, acting
Sheriff of Washington County; MICHAEL
JOHNSON,

    Defendants - Appellants,

and

JUDD LAROWE; JON WORLTON,

    Defendants.

_____

MARTIN CROWSON,

    Plaintiff - Appellee,

v.

JUDD LAROWE,

    Defendant - Appellant,

and

WASHINGTON COUNTY STATE OF
UTAH; CORY PULSIPHER, acting
Sheriff of Washington County; MICHAEL

No. 19-4118

No. 19-4120

JOHNSON; JON WORLTON,

     Defendants.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:15-CV-00880-TC)**

_____

Frank D. Mylar (Andrew R. Hopkins with him on the briefs), Mylar Law, P.C., Salt Lake City, Utah, for Defendants - Appellants Michael Johnson, Washington County, and Sheriff Cory Pulsipher.

Gary T. Wight (Shawn McGarry and Jurhee A. Rice with him on the briefs), Kipp and Christian, P.C., Salt Lake City, Utah, for Defendant - Appellant Judd LaRowe, M.D.

Devi Rao, Roderick & Solange MacArthur Justice Center, Washington, D.C. (Megha Ram, Roderick & Solange MacArthur Justice Center, Washington, D.C.; Ryan J. Schriever, The Schriever Law Firm, Spanish Fork, Utah; David M. Shapiro, Roderick & Solange, MacArthur Justice Center, Northwestern Pritzker School of Law, Chicago, Illinois, on the briefs) for Plaintiff - Appellee Martin Crowson.

_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

     Martin Crowson was an inmate at the Washington County Purgatory Correctional Facility (the "Jail") when he began suffering from symptoms of toxic metabolic encephalopathy. Nurse Michael Johnson and Dr. Judd LaRowe, two of the medical staff members responsible for Mr. Crowson's care, wrongly concluded Mr. Crowson was experiencing drug or alcohol withdrawal. On the seventh day of medical observation, Mr. Crowson's condition deteriorated and he was transported to

2

the hospital, where he was accurately diagnosed. After Mr. Crowson recovered, he sued Nurse Johnson, Dr. LaRowe, and Washington County[1] under 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments.

The district court denied motions for summary judgment on the issue of qualified immunity by Nurse Johnson and Dr. LaRowe, concluding a reasonable jury could find both were deliberately indifferent to Mr. Crowson's serious medical needs, and that it was clearly established their conduct amounted to a constitutional violation. The district court also denied the County's motion for summary judgment, concluding a reasonable jury could find the treatment failures were an obvious consequence of the County's reliance on Dr. LaRowe's infrequent visits to the Jail and the County's lack of written protocols for monitoring, diagnosing, and treating inmates.

Nurse Johnson, Dr. LaRowe, and the County filed these consolidated interlocutory appeals, which raise threshold questions of jurisdiction. Nurse Johnson and Dr. LaRowe challenge the district court's denial of qualified immunity, while the

---

[1] Mr. Crowson also sued Cory Pulsipher, the acting Sheriff of Washington County, in his official capacity. But official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. The district court and the parties have treated Mr. Crowson's *Monell* claims against Sheriff Pulsipher accordingly. *See, e.g.*, App., Vol. I at 209 n.1; Appellee Br. at 7 n.2. We therefore refer only to Washington County.

County contends we should exercise pendent appellate jurisdiction to review the district court's denial of its summary judgment motion.[2]

For the reasons explained below, we exercise limited jurisdiction over Nurse Johnson's and Dr. LaRowe's appeals pursuant to the exception to 28 U.S.C. § 1291 carved out for purely legal issues of qualified immunity through the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). We hold Nurse Johnson's conduct did not violate Mr. Crowson's rights and, assuming without deciding that Dr. LaRowe's conduct did, we conclude Dr. LaRowe's conduct did not violate any clearly established rights.

Our holding on Nurse Johnson's appeal is inextricably intertwined with the County's liability on a failure-to-train theory, so we exercise pendent appellate jurisdiction to the extent Mr. Crowson's claims against the County rest on that theory. *See Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995). However, under our binding precedent, our holdings on the individual defendants' appeals are not inextricably intertwined with Mr. Crowson's claims against the County to the extent he advances a systemic failure theory. *See id.* We therefore reverse the district court's denial of summary judgment to Nurse Johnson and

---

[2] Nurse Johnson and the County's Opening Brief is cited herein as "County Br.," and their Reply Brief is cited as "County Reply." Dr. LaRowe's Opening Brief is cited as "LaRowe Br.," and his Reply brief is cited as "LaRowe Reply." Mr. Crowson's Brief is cited as "Appellee Br."

Dr. LaRowe, as well as to the County on the failure-to-train theory, and we dismiss the remainder of the County's appeal for lack of jurisdiction.

## I.    BACKGROUND

### A.  *Factual History*[3]

On June 11, 2014, Mr. Crowson was booked into the Washington County Purgatory Correctional Facility for a parole violation. On June 17, due to a disciplinary violation, Mr. Crowson was placed in solitary confinement, known as the "A Block."

"On the morning of June 25, while still in solitary confinement, Jail Deputy Brett Lyman noticed that Mr. Crowson was acting slow and lethargic." App., Vol. I at 205. Deputy Lyman asked Nurse Johnson to check Mr. Crowson. "As a registered nurse, Nurse Johnson could not formally diagnose and treat Mr. Crowson." App., Vol. I at 205. Rather, Nurse Johnson assessed inmates and communicated with medical staff. The medical staff available to diagnose were Jon Worlton, a physician assistant ("PA"),[4] and Dr. LaRowe, the Jail's physician.

---

[3] Because our interlocutory review of an order denying qualified immunity is typically limited to issues of law, this factual history is drawn from the district court's recitation of the facts. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985).

[4] There is some ambiguity concerning whether Jon Worlton was, in fact, a PA. The district court found he was a PA. At oral argument, the County asserted that Mr. Worlton was a nurse practitioner, not a PA, but suggested that accorded him similar or greater medical training. In describing his education, Mr. Worlton stated, "I'm a social worker. I have a master's degree in social work. I also have a clinical license, licensed clinical social worker." App., Vol. II at 478. At oral argument before this court, however, counsel for Mr. Crowson answered affirmatively when asked whether Mr. Worlton was a PA and whether he could diagnose inmates. Where neither party has challenged the district court's finding that Mr. Worlton was a PA,

At all relevant times, PA Worlton was the Jail's health services administrator and also handled mental health care for the inmates. PA Worlton spent half to three quarters of his time in clinical practice at the Jail, primarily in booking. Dr. LaRowe was responsible for diagnosing and treating inmates, but he visited the Jail only one or two days a week, for two to three hours at a time. Dr. LaRowe relied heavily on the Jail's deputies and nurses. Jail deputies checked on inmates who were in medical observation cells at least once every thirty minutes, and the deputies would notify a Jail nurse when an inmate was "not acting right" or "having problems." App., Vol. I at 219 (quoting App., Vol. II at 504). "Jail nurses—who, by law, could not diagnose inmates—generally spent five to ten minutes with" inmates in medical observation cells once every twelve-hour shift, "to take the inmate's vital signs and conduct follow-up checks." App., Vol. I at 219. If an inmate exhibited symptoms of a cognitive problem, the nurse would inform Dr. LaRowe and PA Worlton. There are no written policies or procedures regarding inmate medical care in the record.

When Nurse Johnson evaluated Mr. Crowson on June 25, he noted Mr. Crowson had normal vital signs and some memory loss. Specifically, "Mr. Crowson was 'dazed and confused,' and 'unable to remember what kind of work he did prior to being arrested.'" App., Vol. I at 213 (quoting App., Vol. II at 374). Nurse Johnson "admitted in his declaration that, despite recording normal vital signs, he 'was concerned [Mr. Crowson] may be suffering from some medical problem.'" App., Vol. I at 213

and Mr. Crowson's counsel affirmed that professional status at oral argument, we presume it is true for purposes of our analysis.

(alteration in original) (quoting App., Vol. II at 317). Nurse Johnson ordered Mr. Crowson moved to a medical observation cell following the examination. He also "entered a request in the medical recordkeeping system for PA Worlton to conduct a psychological evaluation." App., Vol. I at 205.

When Jail Deputy Fred Keil moved Mr. Crowson to a medical observation cell, he noticed that Mr. Crowson appeared "unusually confused." App., Vol I at 205. After conducting a visual body cavity search of Mr. Crowson, Deputy Keil ordered Mr. Crowson to re-dress. Mr. Crowson put on his pants and then put his underwear on over his pants.

Nurse Johnson checked Mr. Crowson again that afternoon. "Mr. Crowson's pupils were dilated but reactive to light" and "Mr. Crowson appeared alert and oriented." App., Vol. I at 206. Nurse Johnson left the Jail at the end of his shift on June 25 without conducting further assessments of Mr. Crowson or contacting Dr. LaRowe. PA Worlton never received Nurse Johnson's file notation requesting a psychological examination of Mr. Crowson.

Nurse Johnson did not work at the Jail on June 26 and 27. There is no documentation in the Jail's medical recordkeeping system for these days to show that medical personnel checked on Mr. Crowson.

On June 28, Nurse Johnson returned to work and visited Mr. Crowson in the early afternoon. "Mr. Crowson seemed confused and disoriented and had elevated blood pressure. He gave one-word answers to Nurse Johnson's questions, and understood, but could not follow, an instruction to take a deep breath." App., Vol. I at 206. At this point,

7

"Mr. Crowson's symptoms had persisted beyond the expected timeframe for substance withdrawal." App., Vol. I at 213.

Following the June 28 examination, Nurse Johnson called Dr. LaRowe and informed him of some of his observations. But Nurse Johnson did not tell Dr. LaRowe that Mr. Crowson had been in a medical observation cell for three days and had been in solitary confinement for nine days before that. Dr. LaRowe ordered a chest x-ray and a blood test. "The blood test, known as a complete blood count, could have detected an acid-base imbalance in Mr. Crowson's blood, a symptom of encephalopathy." App., Vol. I at 206.

Nurse Johnson attempted to draw Mr. Crowson's blood, but he was unsuccessful due to scarring on Mr. Crowson's veins and Mr. Crowson's unwillingness to hold still. Nurse Johnson reported this unsuccessful blood-draw attempt to Dr. LaRowe. Ultimately, the chest x-ray and blood test were never completed. Dr. LaRowe made no further attempts to diagnose Mr. Crowson at that time.

On the morning of June 29, Nurse Johnson took Mr. Crowson's vital signs and noted an elevated heart rate. "Mr. Crowson was still acting dazed and confused, and was experiencing delirium tremens, a symptom of alcohol withdrawal." App., Vol. I at 206–07. Nurse Johnson reported his observations to Dr. LaRowe, who prescribed Librium and Ativan to treat substance withdrawal. Dr. LaRowe directed Nurse Johnson to administer a dose of Ativan.[5]

_____

[5] Mr. Crowson's circumstances prior to his incarceration suggest these medications may have been harmful to him beyond worsening his encephalopathy.

"An hour later, Nurse Johnson checked on Mr. Crowson, who was sleeping, and noted that his vital signs had returned to normal." App., Vol. I at 207. He next checked on Mr. Crowson later that afternoon. "He noted that Mr. Crowson was better able to verbalize his thoughts and that his vital signs remained stable." App., Vol. I at 207. But Mr. Crowson continued to report memory loss, telling Nurse Johnson that he could not remember the last five days. Nurse Johnson, believing Mr. Crowson was experiencing substance withdrawal, told Mr. Crowson that he was in a medical observation cell, and he was being given medication for his condition.

The following day (June 30), Nurse Ryan Borrowman was assigned to the medical holding area. Nurse Borrowman did not see Mr. Crowson until July 1, when he noted that Mr. Crowson's "physical movements were delayed and that he struggled to focus and would lose his train of thought." App., Vol. I at 207. "[D]ue to the severity of [Mr. Crowson's] symptoms and the length of time he had been in a medical holding cell, [Nurse Borrowman] immediately called Dr. LaRowe for further medical care." App., Vol. II at 313. Upon Dr. LaRowe's order, Mr. Crowson was transported to the Dixie Regional Medical Center, where he was diagnosed with metabolic encephalopathy. Dr. LaRowe never visited the Jail while Mr. Crowson was in the medical observation cell.

---

He was hospitalized at Dixie Regional Medical Center "a few weeks before being arrested and detained" at the Jail. App., Vol. I at 207. The amended complaint indicates medical records from this hospitalization "'would have revealed to Facility staff that [he] should not have been given any drug categorized as a benzodiazepine' (such as Librium)." App., Vol. 1 at 207–08. That prior hospitalization appears to have been the result of a heroin overdose.

"According to the amended complaint, Mr. Crowson remained in the hospital until July 7, 2014, and continued to suffer from 'residual effects of encephalopathy, liver disease, and other problems.'" App., Vol. I at 208 (quoting App., Vol. I at 39). Mr. Crowson spent two months recovering at his mother's house, experiencing severe memory and focus problems, before returning to the Jail on September 7, 2014.

### B. *Procedural History*

Mr. Crowson filed a Complaint on December 15, 2015, which he amended on March 14, 2016. The Amended Complaint brings, *inter alia*, § 1983 claims against Nurse Johnson and Dr. LaRowe alleging they were deliberately indifferent to Mr. Crowson's serious medical needs in violation of Mr. Crowson's Eighth and Fourteenth Amendment rights. The Amended Complaint also includes § 1983 claims against Washington County pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).[6]

In 2018, Nurse Johnson, Dr. LaRowe, and Washington County moved for summary judgment. Nurse Johnson and Dr. LaRowe argued they were entitled to qualified immunity. The County argued that none of its employees committed a constitutional violation and that there is no evidence of a County policy or custom that caused the alleged constitutional violation. On July 19, 2019, the district court denied the motions in relevant part. The district court concluded a reasonable jury could find Nurse Johnson and Dr. LaRowe were deliberately indifferent to

---

[6] These are the only surviving claims and defendants. Other parties and claims have been dismissed by various court orders and party stipulations.

10

Mr. Crowson's medical needs, and that it was clearly established their conduct amounted to a constitutional violation. The district court also concluded a reasonable jury could find the treatment failures were an obvious consequence of the County's reliance on Dr. LaRowe's infrequent visits to the Jail and the County's lack of written protocols for monitoring, diagnosing, and treating inmates. Nurse Johnson, Dr. LaRowe, and Washington County filed these consolidated interlocutory appeals.

## II. DISCUSSION

We begin our analysis by examining the individual defendants before turning to the County. Mr. Crowson challenges our jurisdiction over this appeal, so each discussion begins with the question of jurisdiction.

### A. *Individual Defendants*

#### 1. Jurisdiction

When examining the denial of summary judgment on the issue of qualified immunity, "this court has jurisdiction to review (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013) (internal quotation marks omitted). Generally, we lack jurisdiction to review factual disputes in this interlocutory posture. *Lynch v. Barrett*, 703 F.3d 1153, 1159 (10th Cir. 2013) ("[I]f a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—

11

and do so even if our own de novo review of the record might suggest otherwise as a matter of law." (quotation marks omitted)).

There is an exception to this jurisdictional limitation "when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record.'" *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In such circumstance, we assess the facts de novo. *Id.* "A mere claim that the record 'blatantly' contradicts the district court's factual recitation . . . does not require us to look beyond the facts found and inferences drawn by the district court. Rather, the court's findings must constitute 'visible fiction.'" *Lynch*, 703 F.3d at 1160 n.2 (quoting *Scott*, 550 U.S. at 380–81). "The standard is a very difficult one to satisfy." *Cordero v. Froats*, 613 F. App'x 768, 769 (10th Cir. 2015) (unpublished).

Nurse Johnson and Dr. LaRowe argue this case is the unusual one where we may review the facts de novo. Because we find reversal is warranted taking the district court's facts as true, we need not analyze whether we would be permitted to consider the facts de novo.

## 2. Merits Analysis

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). When a § 1983 defendant asserts qualified immunity, this affirmative defense "creates a

12

presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). "To overcome this presumption," the plaintiff "must show that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Id.* (quoting *Mullenix*, 577 U.S. at 11).

Mr. Crowson alleges Nurse Johnson and Dr. LaRowe violated his Eighth and Fourteenth Amendment rights. "The Fourteenth Amendment prohibits deliberate indifference to a pretrial detainee's serious medical needs." *Strain v. Regalado*, 977 F.3d 984, 987 (10th Cir. 2020). "[W]e apply the two-part Eighth Amendment inquiry when a pretrial detainee alleges deliberate indifference to serious medical needs." *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1028 (10th Cir. 2020). "This exercise requires both an objective and a subjective inquiry." *Id.*[7] "The objective component is met if the deprivation is 'sufficiently serious.' . . . The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1970)).

---

[7] Mr. Crowson argues the standard should be purely objective under *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). But during the pendency of this appeal, a panel of this court held, in a published opinion, "deliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component, even after *Kingsley*." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020). We are bound by the holding in *Strain*. *See Scalia v. Paragon Contractors Corp.*, 957 F.3d 1156, 1162 (10th Cir. 2020).

13

As for the requirement it be clearly established that the conduct constituted a violation, "'the salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[F]or the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation marks omitted). We may not "define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Nevertheless, our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quotation marks omitted).

*a.     Nurse Johnson*

We assume without deciding that the harm suffered by Mr. Crowson meets the objective component of the Eighth Amendment inquiry. Nurse Johnson argues he was not deliberately indifferent under the subjective component. We agree.

"Our cases recognize two types of conduct constituting deliberate indifference. First, a medical professional may fail to treat a serious medical condition properly"; second, a prison official may "prevent an inmate from receiving treatment or deny

14

him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. Although medical personnel often face liability for failure to treat under the first type of deliberate indifference, if "the medical professional knows that his role . . . is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, . . . he also may be liable for deliberate indifference from denying access to medical care." *Id.* Mr. Crowson argues Nurse Johnson's conduct falls within this second type of deliberate indifference.

The district court agreed, finding Nurse Johnson was deliberately indifferent on June 25 when he "placed Mr. Crowson in an observation cell and left his shift without ensuring that Mr. Crowson would receive further care," and on June 28 when he "failed to tell Dr. LaRowe that Mr. Crowson had already been in a medical observation cell for three days and in solitary confinement for nine days before that." App., Vol. I at 213. On appeal, Nurse Johnson argues the district court erred in "infer[ring his] knowledge of an excessive risk of inmate harm" and claims that by referring Mr. Crowson to PA Worlton, he "fulfilled any possible gatekeeper role." County Br. at 25, 28. Regarding his June 28 visit to see Mr. Crowson, Nurse Johnson argues "he fully fulfilled his 'gatekeeper' role by simply communicating with Dr. LaRowe" and that "the failure to pass on some information is in the form of negligence and not 'deliberate indifference.'" County Br. at 27, 29.

In response, Mr. Crowson claims Nurse Johnson's June 25 attempted referral to PA Worlton for a psychological evaluation, without also referring him to Dr. LaRowe for a physical evaluation, "prevent[ed Mr. Crowson's] *physical*

15

symptoms from being evaluated and treated." Appellee Br. at 24. Mr. Crowson also contends Nurse Johnson's admitted concern that Mr. Crowson might be suffering from a medical problem "indicate[s] that the risk of harm was obvious *and* that [Nurse] Johnson was aware of the risk on June 25." *Id.* at 25. Regarding the June 28 conduct, Mr. Crowson argues Nurse Johnson failed to pass on "critical information" that Dr. LaRowe could have used to rule out withdrawal as a possible diagnosis. *Id.*

We address each instance of deliberately indifferent conduct found by the district court.

### i. The referral to PA Worlton for psychological evaluation

We agree with the district court that the evidence would allow a jury to conclude Nurse Johnson was aware Mr. Crowson required medical attention. *See* App., Vol. I at 213 ("Nurse Johnson himself noted that Mr. Crowson was 'dazed and confused,' and 'unable to remember what kind of work he did prior to being arrested.' He admitted in his declaration that, despite recording normal vital signs, he 'was concerned [Mr. Crowson] may be suffering from some medical problem.'" (alteration in original) (first quoting App., Vol. II at 374; then quoting App., Vol. II at 317)). Nurse Johnson therefore knew Mr. Crowson had potentially alarming symptoms and suspected there was a medical issue. That knowledge was sufficient to trigger Nurse Johnson's duty as a gatekeeper to provide Mr. Crowson access to medical personnel who could provide care.

On June 25, Nurse Johnson assessed Mr. Crowson and "entered a request in the medical recordkeeping system for PA Worlton to conduct a psychological

16

evaluation." App. I at 205. Nurse Johnson then left the Jail, without also contacting Dr. LaRowe. Upon Nurse Johnson's return on June 28, he did contact Dr. LaRowe about Mr. Crowson's symptoms.

Although the initial referral to PA Worlton was for a psychological examination, rather than a physiological one, that was consistent with Nurse Johnson's belief Mr. Crowson was suffering from psychological issues caused by the ingestion of illicit drugs or alcohol. Further, nothing in the record or the district court's opinion suggests PA Worlton—if presented with clear signs of medical distress—would have limited the examination of Mr. Crowson to psychological issues. Indeed, as the health services administrator for the Jail, PA Worlton could refer Mr. Crowson to Dr. LaRowe as necessary. And, unlike Dr. LaRowe, PA Worlton spent much of his time at the Jail.

In his gatekeeping role, Nurse Johnson was required to inform medical staff who could diagnose and treat a pretrial detainee exhibiting concerning symptoms. He attempted to do so by requesting a psychological evaluation of Mr. Crowson, making notations in Mr. Crowson's file, and having discussions with PA Worlton about Mr. Crowson's condition.[8]

---

[8] The district court's statement that PA Worlton "never received Nurse Johnson's request for a psychological examination," App., Vol. I at 206, does not take into account PA Worlton's deposition testimony that Nurse Johnson told PA Worlton he was "concerned that [Mr. Crowson] had gotten involved in some drugs or homemade alcohol on the block or something and he asked me to take a look at him," App., Vol. II at 482. On appeal, Mr. Crowson does not ask us to ignore that testimony, but rather argues it is irrelevant because it related to Mr. Crowson's mental health rather than physical health, an argument we reject *supra*. However, the

17

It is true that Nurse Johnson could have done more. He could have ensured that the referral reached PA Worlton, communicated the severity of Mr. Crowson's condition, or contacted Dr. LaRowe immediately. But Nurse Johnson did not "deny [Mr. Crowson] access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. He left a notation in Mr. Crowson's file regarding the referral to PA Worlton, who, as the health services administrator, was not bound by Nurse Johnson's presumption that the examination should focus on psychological issues.

Because Nurse Johnson did not "completely refuse[] to fulfill [his] duty as gatekeeper," and instead, referred the "prisoner to a physician assistant for medical treatment," *Mata v. Saiz*, 427 F.3d 745, 758 (10th Cir. 2005), he was not deliberately indifferent to his gatekeeper role. *Id.* Nurse Johnson's attempted method of referral may have been negligent, but it was not deliberately indifferent. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

> ii.  June 28 referral to Dr. LaRowe

Mr. Crowson next claims he had been in custody too long still to be suffering from withdrawal related to pre-incarceration drug use, and Nurse Johnson's failure to inform Dr. LaRowe on June 28 of how long Mr. Crowson had been in custody thus

electronic referral sufficed to fulfill Nurse Johnson's duty, even if negligently made; accordingly, we need not determine whether the district court's findings of fact were blatantly contradicted by the record.

constitutes deliberate indifference. Based on our decision in *Sealock*, we disagree. There, the plaintiff was incarcerated and experiencing numerous medical symptoms. *Sealock*, 218 F.3d at 1208. After repeated requests, he was moved to the infirmary where he told the nurse "he had chest pain and couldn't breathe." *Id.* The nurse informed the plaintiff "that he had the flu and that there was nothing she could do for him until the physician's assistant arrived at 8:00 a.m." *Id.* Whether the nurse informed the PA that the plaintiff was experiencing chest pains was a disputed fact— the nurse testified she had, the PA testified she had not. *Id.* at 1212. According to the PA, had he been informed of the chest pains, he would have called an ambulance to take the plaintiff to the emergency room. *Id.* at 1208. Instead the PA prescribed medication and the plaintiff was not treated for his actual condition—a heart attack— until the next day. *Id.* We affirmed the district court's grant of summary judgment to the nurse, reasoning, "[a]t worst," the nurse "misdiagnosed" the inmate and failed to pass on information to the PA about the inmate's chest pain. *Id.* at 1211. Although the nurse omitted this critical symptom, we concluded it did not demonstrate that she behaved with deliberate indifference. *See id.*

The same is true here. On June 28, Nurse Johnson did "alert Dr. LaRowe to Mr. Crowson's condition." App., Vol. I at 213. Via that telephone call, Nurse Johnson fulfilled his gatekeeping role "by communicating the inmate's symptoms to a higher-up." *Burke v. Regalado*, 935 F.3d 960, 993 (10th Cir. 2019). To be sure, Nurse Johnson could have volunteered information about the length of Mr. Crowson's detention that might have assisted Dr. LaRowe in reaching a diagnosis. As

19

in *Sealock*, however, Nurse Johnson did not act with deliberate indifference by failing to do so. At worst, Nurse Johnson incorrectly concluded Mr. Crowson was suffering withdrawal, based on an assumption that Mr. Crowson had obtained an illicit substance while incarcerated, and Nurse Johnson then negligently failed to pass along information concerning the length of Mr. Crowson's incarceration.

*** 

In summary, Nurse Johnson did not violate Mr. Crowson's Fourteenth Amendment rights on June 25 or June 28. The referral to PA Worlton fulfilled Nurse Johnson's gatekeeping function by passing Mr. Crowson to the health services administrator who was capable of making a further referral. Likewise, Nurse Johnson was not deliberately indifferent to Mr. Crowson's medical needs on June 28, despite his failure to notify Dr. LaRowe of the length of Mr. Crowson's detention. We therefore reverse the district court's denial of qualified immunity to Nurse Johnson.

### b.     Dr. LaRowe

Mr. Crowson contends that, by failing to obtain a blood test, Dr. LaRowe exhibited deliberate indifference to Mr. Crowson's serious medical condition. For purposes of this analysis, we assume without deciding that Mr. Crowson has satisfied the first requirement to overcome a claim of qualified immunity: violation of Mr. Crowson's constitutional right. We therefore proceed directly to the second prong of the qualified immunity analysis: whether the violation was clearly established.[9] *See*

---

[9] Mr. Crowson asserts that Dr. LaRowe is a private contractor who is not entitled to assert a defense of qualified immunity under *Richardson v. McKnight*, 521

20

*Pearson*, 555 U.S at 236 (holding courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The district court relied on our decision in *Mata* to conclude it was clearly established that Dr. LaRowe's failure to complete the blood test violated Mr. Crowson's constitutional rights. In doing so, the district court stated that "Dr. LaRowe 'did not simply misdiagnose' Mr. Crowson, he 'refused to assess or diagnose [his] condition at all' and simply assumed he was experiencing substance withdrawals." App., Vol. I at 216–17 (alteration in original) (quoting *Mata*, 427 F.3d at 758). Dr. LaRowe argues he "is entitled to qualified immunity because no law

---

U.S. 399 (1997). Although Mr. Crowson concedes he did not raise this argument before the district court, he requests we consider it as an argument for affirmance on alternate grounds. Not only did Mr. Crowson fail to raise this argument before the district court, his briefing on appeal treats it only perfunctorily. The entirety of his legal argument relies on *Richardson* and consists of one sentence: "[T]he Supreme Court has concluded that similarly-situated 'private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case.'" Appellee Br. at 38 (quoting *Richardson*, 521 U.S. at 412). Mr. Crowson's one-sentence argument not only overlooks the limited nature of the Supreme Court's holding in *Richardson*, but also does not address the rule outlined in *Richardson* and reiterated in *Filarsky v. Delia*, 566 U.S. 377 (2012), for determining when a private party may assert a qualified immunity defense. Mr. Crowson also does not acknowledge that other circuits are split on whether private health care providers hired by the state may assert a qualified immunity defense. If we were to consider this argument, the result would be deepening a circuit split without the benefit of adequate adversarial briefing on the issue. We therefore decline to reach this argument. *See Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004).

21

characterized misdiagnosis of an inmate's substance withdrawal as a constitutional violation at the time he treated [Mr.] Crowson." LaRowe Reply at 19.

In the district court's view, Dr. LaRowe failed to assess or diagnose Mr. Crowson because Dr. LaRowe did not ensure complete diagnostic testing before prescribing medication for withdrawal. The district court reasoned that Dr. LaRowe "did not *mis*diagnose Mr. Crowson, but rather failed to conduct diagnostic tests that would have informed him of Mr. Crowson's medical needs" because, "despite vague and nonspecific symptoms, he prescribed medication based on his unverified suspicion that Mr. Crowson was suffering from withdrawals." App., Vol. I at 215–216. We do not reconsider the facts found by the district court, but we are not bound by the district court's conclusion that those facts amounted to a failure to diagnose rather than a misdiagnosis as a matter of law.

Although Dr. LaRowe failed to obtain complete diagnostic testing, he ultimately prescribed medication to treat withdrawal. Thus, Dr. LaRowe apparently determined Mr. Crowson's symptoms were caused by withdrawal, and prescribed medication to treat that condition. Although Dr. LaRowe's diagnosis would have been better informed by the blood test, we cannot conclude that Dr. LaRowe failed to make a diagnosis at all.

The question presented, then, is whether it was clearly established that reaching a diagnosis without blood test results violated the plaintiff's rights where the plaintiff's symptoms were consistent with either withdrawal or encephalopathy. For law to be clearly established, "[t]he precedent must be *clear enough* that every

22

reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Brown v. Flowers*, 974 F.3d 1178, 1184 (10th Cir. 2020) (alteration in original) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). "But even when such a precedent exists, subsequent [controlling] cases may conflict with or clarify the earlier precedent, rendering the law unclear." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). When "the question is within the realm of reasonable debate," the law is not clearly established. *Id.* at 1078.

The facts of this case fall between two lines of precedent. On the one hand, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment[;] [a]t most it is medical malpractice." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). If he had never ordered it, then, Dr. LaRowe's failure to obtain a blood test would be at most medical malpractice. *See id.* Similarly, if Dr. LaRowe had treated Mr. Crowson for withdrawal based on vague, nonspecific symptoms, that alone would not be enough to prove deliberate indifference. *See Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006) ("Where a doctor faces symptoms that could suggest either indigestion or stomach cancer, and the doctor mistakenly treats indigestion, the doctor's culpable state of mind [i.e., deliberate indifference] is not established even if the doctor's medical judgment may have been objectively unreasonable.").

On the other hand, in *Mata* we concluded that a nurse who did a physical exam and performed an EKG that produced normal results before sending an inmate away was not deliberately indifferent because she "made a good faith effort to diagnose

23

and treat" the inmate. *Mata*, 427 F.3d at 760–61. *Mata* establishes that a medical professional faced with symptoms of a serious medical condition must make some effort to assess and treat the patient. *See Quintana*, 973 F.3d at 1033 ("[I]t [is] clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights."). But *Mata* does not require a medical professional to perform any diagnostic testing, let alone any specific diagnostic testing, to avoid liability.

Here, Dr. LaRowe ordered diagnostic testing, was informed the testing could not be completed, and did not make further attempts to test. Instead, he began treatment for what he deemed the likely cause of Mr. Crowson's symptoms. Even where the blood test would have provided information that could have better informed the diagnosis, the parties do not cite, and we have not found, any decision from the Supreme Court or this court that would have put Dr. LaRowe on notice that his conduct violated Mr. Crowson's Fourteenth Amendment rights.

Mr. Crowson points to our decision in *Mata* and asserts that an official can be liable if he "declined to confirm inferences of risk that he strongly suspected to exist." *Mata*, 427 F.3d at 752 (quoting *Farmer*, 511 U.S. at 843 n.8). But there is nothing that suggests Dr. LaRowe strongly suspected Mr. Crowson was suffering from encephalopathy. To the contrary, Dr. LaRowe suspected Mr. Crowson was suffering from withdrawal, as is indicated by the medication he prescribed. And, like the inmate in *Estelle,* Mr. Crowson's symptoms were consistent with either diagnosis.

24

To conclude *Mata* put all reasonable doctors on notice that failing to obtain a test result violates an inmate's rights would place the notice at too high a level of generality. As discussed, *Mata* does not require testing and, consequently, Dr. LaRowe's conduct falls into a grey area created by the holdings of *Estelle* and *Self* on the one hand and *Mata* on the other. We therefore cannot conclude that every reasonable official would have known it was a violation of Mr. Crowson's constitutional rights to proceed with a diagnosis in the absence of blood test results. Rather, it fell within the realm of reasonable debate. *See Apodaca*, 864 F.3d at 1078.

*** 

For purposes of our analysis, we assume Dr. LaRowe violated Mr. Crowson's Fourteenth Amendment rights by treating him for withdrawal without first obtaining the results from a previously ordered blood test. Because we have found no decisions from the Supreme Court or this court that clearly establish the unconstitutionality of such conduct, we conclude Dr. LaRowe is entitled to qualified immunity, and we reverse the district court's denial of summary judgment.

### B. Institutional Defendant

Mr. Crowson also claims the County is liable because it "failed to enact adequate policies and properly train its nurses despite relying on the nurses to provide the bulk of medical care." Appellee Br. at 49. To state a claim against a municipal entity in this context, "plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Quintana*, 973 F.3d at 1034. Under our precedent, any of the following constitute an official policy:

25

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & County of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quotation marks omitted).

Mr. Crowson argued to the district court that the County was "deliberately indifferent to the risk of having nurses who were not trained and did not have policies to follow." App., Vol. I at 137. The district court treated this issue as encompassing both a failure-to-train claim and a systemic-failure claim: "Mr. Crowson alleges that Washington County is liable for its failure to train Jail nurses—specifically, for its failure to promulgate written policies for Jail nurses to follow," and cited the proper standard for failure to train. App., Vol. I at 218. The district court found that the "County's healthcare policies at the time of Mr. Crowson's incarceration seem severely lacking." App., Vol. I at 218. It further noted that there were "no written policies in the record," and that the Jail's general practices for providing medical care to inmates had to be pieced together from the deposition testimony of various medical personnel. App., Vol. I at 218–19. The district court also considered Jail policy that required Dr. LaRowe to rely heavily on the Jail's deputies and nurses because although he "was responsible for diagnosing and treating inmates, [he] only

26

visited the Jail one or two day[s] a week." App., Vol. I at 219. These deficiencies

were compounded by the practices at the Jail. The district court observed:

> When an inmate was placed in a medical observation cell, Jail deputies
> observed inmates at least once every thirty minutes, and would notify a Jail
> nurse when "this guy is not acting right or this guy is having problems."
> (Dep. of Michael Johnson at 32:4–10 (ECF No. 76-7).) Jail nurses—who,
> by law, could not diagnose inmates—generally spent five to ten minutes
> with the inmate once every twelve-hour shift, to take the inmate's vital
> signs and conduct follow-up checks. If an inmate exhibited symptoms of a
> cognitive problem (as did Mr. Crowson), the nurse would inform
> Dr. LaRowe and PA Worlton, who, in addition to his role as the Jail's
> health services administrator, handles mental health care.

App., Vol. I at 219.

The district court found that the Jail's practices left the nurses "largely to their

own devices." App., Vol. I at 219. This was particularly true as to brain injuries because

the "Jail has no guidelines or written policies" for assessing them. App., Vol. I at 219.

While Dr. LaRowe did provide training for alcohol withdrawal, Nurse Johnson "could

not remember a protocol or standards for assessing withdrawal symptoms," and PA

Worlton testified the Jail did not have a written policy governing placement of inmates in

observation cells for detox or evaluation of the inmate thereafter. App., Vol. I at 219. The

district court also found it significant that Dr. LaRowe was unaware of any Jail policy for

nurses to follow in determining when an inmate should be transported to the hospital.

App., Vol. I at 219. From this evidence, the district court found: "Remarkably, it appears

from the record that Washington County failed to promulgate written policies pertaining

to the Jail's core healthcare functions." App., Vol. I at 220. And it further concluded that

a reasonable jury could find that Mr. Crowson's injuries were "an obvious consequence

27

of the County's reliance on a largely absentee physician, and an attendant failure to promulgate written protocols for monitoring, diagnosing, and treating inmates." App., Vol. I at 220. The district court, therefore, considered the problems created both by the failure to train and by the failure to adopt written policies.

Before we reach the merits of Mr. Crowson's claims against the County, we must determine whether we have jurisdiction to consider those claims in this interlocutory appeal. We have discretion to exercise pendent appellate jurisdiction over the County's appeal to the extent the issues it raises are "inextricably intertwined" with the district court's denial of qualified immunity to the individual defendants. *See Moore*, 57 F.3d at 930 (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)). If resolution of the collateral qualified immunity appeal "*necessarily* resolves" the County's issues on appeal, then those otherwise nonappealable issues are "inextricably intertwined" with the appealable decision. *Id.* But "if our ruling on the merits of the collateral qualified immunity appeal [would] not resolve all of the remaining issues presented by the [County]," then we lack jurisdiction to consider the County's appeal. *Id.*

To place the analysis of our jurisdiction over the claims against the County in context, we pause to set forth the relevant legal background.

### 1. Legal Background

Mr. Crowson asserts two related claims against the County: (1) failure to train its nurses; and (2) reliance on policies and procedures that were deliberately

28

indifferent to prisoners' medical needs. Only the first of these claims is inextricably intertwined with the claims of the individual defendants, as we shall now explain.

In *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), we addressed a claim for deliberate indifference against a municipality under circumstances like the present. There, the family of a pretrial detainee who died while housed in the Salt Lake County Jail sued various officials and the county. *Id.* at 305. According to the plaintiffs, the detainee's death was the result of official policies and practices of the county that were deliberately indifferent to the serious medical needs of persons confined in the Salt Lake County Jail. *Id.* A panel of this court allowed the jury verdict against the county to stand despite the absence of individual liability as to any county employee. *Id.* The panel concluded that where the county's policy, or lack of policies, evinces deliberate indifference, the county can be liable even in the absence of individual liability by any county actor. *See id.* at 306–07. We explained: "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Id.* at 308. And even where "the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* at 310.

There is some tension in our subsequent caselaw with respect to this conclusion in *Garcia*. In multiple cases we have made statements that suggest a claim

29

against a municipality may never lie where none of the municipality's individual officers are liable under § 1983. When examined more carefully, however, most of these decisions can be harmonized with the Supreme Court's and our prior decisions. Demarcating the precise dividing line in our precedent, moreover, demonstrates why our jurisdiction in this posture extends to only one of Mr. Crowson's theories of municipal liability.

To frame our prior decisions, it is important to begin with the Supreme Court's direction in *Collins v. City of Harker Heights* that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." 503 U.S. 115, 120 (1992). The absence of an affirmative answer to either of these questions is fatal to a claim against the municipality.

With respect to the first question, a claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no constitutional violation. *Id.* at 130 (affirming dismissal of action where none of plaintiff's allegations set forth a constitutional violation). In *Washington v. Unified Government of Wyandotte County*, for example, we acknowledged that "a municipality may be liable under § 1983 where the plaintiff identifies an unconstitutional policy that caused the claimed injury." 847 F.3d 1192, 1197 (10th Cir. 2017). However, once we concluded the plaintiff had failed to show any constitutional violation, we affirmed the district court's decision rejecting the claims

30

against all defendants, including the county. *Id.* at 1197–1203; *see also Lindsey v. Hyler*, 918 F.3d 1109, 1116–17 (10th Cir. 2019) (rejecting plaintiffs' failure-to-train claim against municipality upon concluding there was no constitutional violation); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1205 n.1 (10th Cir. 2004) (rejecting claims against city after affirming summary judgment for individual actors due to the lack of any constitutional violation); *Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Cir. 2001) (rejecting claims against county because the individual officer had not violated constitutional right to privacy or substantive due process of surviving wife and children); *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1152, 1154–55 (10th Cir. 2001) (rejecting claims against county for failure to train and failure to adopt appropriate policies where individual officers had not violated the constitutional rights of driver killed by suspect fleeing police).

We turn next to the second question identified in *Collins*: whether the municipality is responsible for the constitutional violation. Sometimes the municipality's failures are the driving force behind a constitutional violation by a specific municipal employee. A failure-to-train claim is an example of these types of § 1983 claims against municipalities.

In *Williams v. City & County of Denver*, we "emphasize[d] the distinction between cases in which a plaintiff seeks to hold a municipality liable for failing to train an employee who as a result acts unconstitutionally, and cases in which the city's failure is itself an unconstitutional denial of substantive due process." 99 F.3d 1009, 1019 (10th Cir. 1996), *reh'g en banc granted on other grounds, opinion*

31

*vacated*, 140 F.3d 855 (10th Cir. 1997), *reh'g en banc sub nom. Williams v. Denver*, 153 F.3d 730 (10th Cir. 1998) (unpublished).[10] We explained that a city may not be held liable for failure to train "when there has been no underlying constitutional violation by one of its employees." 99 F.3d at 1018. By contrast, where the claim is premised upon a formally promulgated policy, well-settled custom or practice, or final decision by a policymaker, we held "the inquiry is whether the policy or custom itself is unconstitutional so as to impose liability on the city for its own unconstitutional conduct in implementing an unconstitutional policy." *Id.*

Although *Williams* has a complex subsequent history, nothing in that history casts doubt on the determination that a failure-to-train claim may not be maintained without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer. *See* 99 F.3d at 1018; *see also Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) (stating that "failure[-]to[-]train claims . . . require[] a predicate showing that the officers did in fact" violate

---

[10] Although the opinion in *Williams* was vacated, it was not reversed by the en banc court. *See* 153 F.3d 730 (10th Cir. 1998) (unpublished). Thus, its expressions on the merits may have at least persuasive value. *See Los Angeles County v. Davis*, 440 U.S. 625, 646 n.10 (1979) (Powell, J., dissenting) (explaining, in regard to a Ninth Circuit judgment vacated by the Supreme Court, that "the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law of the Ninth Circuit"); *cf. Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1133 (10th Cir. 2010) (explaining that "since the district court's opinion[s] will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts [and litigants] will be able to consult [their] reasoning" (alterations in original) (quoting *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997))).

the decedent's rights). Thus, under *Williams,* our conclusion that the claim against Nurse Johnson fails on summary judgment necessarily also defeats the failure-to-train claim against the County, which is premised only upon the County's failure to train its nurses.

Where the claim against the municipality is not dependent upon the liability of any individual actor, however, our precedent is less clear. Recall that in *Garcia,* we held: "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." 768 F.2d at 308. More recently, however, we reached a contrary conclusion. *See Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009).

In *Martinez*, an estate brought § 1983 claims against individual jailers and against the Sheriff acting in his official capacity for the county after a man died in police custody. *Id.* at 1084. The decedent's estate alleged the individual defendants were deliberately indifferent to the decedent's serious medical needs, resulting in a violation of his constitutional rights. *Id.* We affirmed the district court's summary judgment in favor of the individual defendants because there was no evidence they had subjective knowledge of the decedent's serious medical condition. *Id.* at 1090–91. And therefore, we held the Sheriff acting in his official capacity could not be "liable for the actions of the officers he trained and supervised" in the absence of a constitutional violation by any of his officers. *Id.* at 1091.

So far, then, *Martinez* tracks our precedent. But next, the panel considered the estate's claim that even "if no single individual county employee is found liable, the county may still be liable for a 'systemic injury' caused by 'the interactive behavior of several government officials, each of whom may be acting in good faith.'" *Id.* at 1092. We rejected that claim, stating, "[t]o the extent this argument suggests that the county can be liable, even if no individual government actor is liable, it is precluded by our prior precedent." *Id.*

In support, we cited *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002). Although *Olsen* did acknowledge that municipalities could not be held liable absent an underlying violation by their officers, *id.* at 1317–18, the claim asserted in that case was for failure to train rather than for a systemic lack of policies and procedures. *Compare Garcia*, 768 F.2d at 310. And in *Olsen*, we ultimately reversed the grant of summary judgment for the officer while affirming the grant of summary judgment for the city on a wholly different ground—that the plaintiff had not produced evidence of deliberate indifference on the city's part. 312 F.3d at 1312–13, 1317–19.

In *Martinez,* however, we went beyond *Olsen* in holding that a § 1983 deliberate indifference claim against a municipality based on systemic failures cannot survive in the absence of a constitutional violation by at least one individual defendant. 563 F.3d at 1092. That holding does not turn on whether the injury was caused by a constitutional violation for which the municipality was responsible, as

34

mandated by *Collins*. *See* 503 U.S. at 120. Instead, it directs that no claim against the municipality can prevail in the absence of a liable individual.

We are unable to reconcile the holdings in *Martinez* and *Garcia*. However, *Garcia* is the earlier published decision, and "when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996). This rule does not hold if our earlier precedent has been reconsidered. *See id*. But we have not overruled *Garcia*; to the contrary, we have relied on it recently. *See Quintana*, 973 F.3d at 1033–34 (marshaling *Garcia* to reject the district court's conclusion that a § 1983 claim premised on deficient medical intake protocol could not lie absent "a viable claim against an individual defendant," because it "does not square with circuit precedent holding that municipal liability under *Monell* may exist without individual liability"). Furthermore, we are not the only circuit to cite *Garcia* recently in the context of this theory of municipal liability. *See Griffith v. Franklin County*, 975 F.3d 554, 581–82 (6th Cir. 2020) (expressing willingness to entertain *Garcia*'s theory of municipal liability, but declining to decide the issue because plaintiff failed to establish a constitutional violation); *Barnett v. MacArthur*, 956 F.3d 1291, 1301–02 (11th Cir. 2020) (allowing § 1983 claim against county to proceed despite a jury finding that the individual officer did not violate the plaintiff's constitutional rights, while determining *Garcia*'s theory of municipal liability to be "not a controversial concept"), *petition for cert. filed sub nom Lemma v. Barnett*, No. 20-595; *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 & n.11 (9th Cir. 2019) (holding

35

that city could be liable for deliberate indifference to safety of pretrial detainee even where no individual officer had violated a clearly established constitutional right).

We are also unconvinced that subsequent pronouncements from the Supreme Court permit us to depart from our published decision in *Garcia. See Haynes*, 88 F.3d at 900 n.4. We decided *Garcia* in 1985. The following year, the Supreme Court held that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). But in *City of Los Angeles v. Heller*, the issue was whether damages could be awarded "against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *Id.*

The subsequent development of our municipal liability caselaw confirms that *Heller* did not undermine *Garcia*. In *Apodaca v. Rio Arriba County Sheriff's Department*, we cited *Heller* in holding, "[w]hen there is no underlying constitutional violation by a county officer, there cannot be an action *for failing to train or supervise the officer*." 905 F.2d 1445, 1447 (10th Cir. 1990) (emphasis added). Three years later, we stated this rule more broadly: "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Heller*, 475 U.S. at 799). But again, we made this statement in the context of the city's failure to train "regarding, or to adopt any written policies regulating, the use of force." *Id.* at 777.

36

Relying on *Heller*, we explained that "where a municipality is 'sued only because [it was] thought legally responsible' for the actions of its officers, it is 'inconceivable' to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have 'authorized' such harm." *Id.* at 782 (alteration in original) (quoting *Heller*, 475 U.S. at 799). "As in *Heller*, Hinton's excessive force claim against the City of Elwood seeks to hold the city liable solely because of the actions of its individual officers." *Id.*

As previously discussed, in *Collins* the Supreme Court recognized a type of § 1983 claim against a municipality that may survive even in the absence of a constitutional violation by a municipal employee. *See* 503 U.S. 115. There, the widow of a municipal employee who died after entering a manhole to service a sewer line, sued the city, claiming the decedent "had a constitutional right to be free from unreasonable risks of harm to his body, mind and emotions and a constitutional right to be protected from the city of Harker Heights' custom and policy of deliberate indifference toward the safety of its employees." *Id*. at 117. The widow's constitutional claim was based on "the substantive component of the [Due Process] Clause that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* at 125 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The Court noted this claim fairly advanced two theories: "that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace, or that the city's 'deliberate indifference' to [the decedent's] safety was arbitrary

37

government action that must 'shock the conscience' of federal judges." *Id.* at 126. After rejecting the first theory as inconsistent with substantive due process precedent, the Court rejected the widow's second theory because her claim was "analogous to a fairly typical state-law tort claim," *id.* at 126–128. As such, it did not meet the requirement of arbitrary government action that shocks the conscience. *Id.* Importantly, the analysis in *Collins* was not driven by the absence of a finding of liability with respect to any individual city employee.

We dissected the meaning of *Collins* for § 1983 municipal liability in *Williams*. *See* 99 F.3d 1009. There, an estate sued the City and County of Denver for the death of a motorist as a result of a collision with a police officer who sped through an intersection against the light and without using a siren. *Id.* at 1012. The estate brought a failure-to-train claim, as well as a substantive due process claim based solely on the city's own actions. *Id.* at 1018. "In light of *Collins*," a panel of this court held a municipality "may be liable for its own unconstitutional policy even if [the individual defendant] is ultimately exonerated," by drawing a "distinction between cases in which a plaintiff seeks to hold a municipality liable for failing to train an employee who as a result acts unconstitutionally, and cases in which the city's failure is itself an unconstitutional denial of substantive due process." *Id.* at 1019. We further held the standard for a substantive due process violation is whether the conduct was conscience-shocking; mere recklessness is insufficient. *Id.* at 1015.

The en banc court granted the municipal defendants' petition for rehearing to address: (1) the proper standard for determining whether the conduct of the officer

38

violated the decedent's constitutional rights, (2) whether under that standard the constitutional determination should be made by a judge or a jury, and (3) whether the municipality could be found liable "by its own conduct or policies in hiring and/or failing to train [the officer], even if the officer's conduct did not violate the constitutional rights of decedent." *Williams v. City & County of Denver*, 140 F.3d 855, 855 (10th Cir. 1997).

The rehearing in *Williams* was subsequently abated pending the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), which directly considered whether the substantive due process analysis in *Williams* was correct. *Id.* at 839–840 (citing *Williams* as part of the circuit split the case was accepted on certiorari to resolve). In *Lewis,* the Court explained it had "always been reluctant to expand the concept of substantive due process." *Id.* at 842 (quoting *Collins*, 503 U.S. at 125). Thus, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id*. (alteration in original) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Where such explicit protection is not provided by another amendment, however, "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* at 847 (quoting *Collins*, 503 U.S. at 128). Thus, the Court's decision in *Lewis* is consistent with the substantive due

process standard we applied in *Williams*. *Id.* at 839–40 (reversing a decision on the other side of a circuit split from *Williams*).

While the *Williams* rehearing was pending, the Supreme Court also decided *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997). There, the Court ruled that to hold a municipality liable under § 1983, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404. In response to these intervening Supreme Court decisions, we vacated the district court's judgment in *Williams* and remanded for the district court to consider their effect. *Williams v. Denver*, 153 F.3d 730, 1998 WL 380518, at *1 (10th Cir. June 26, 1998) (unpublished).

We returned to the relevant question in *Trigalet v. City of Tulsa*. *See* 239 F.3d 1150. There, "we consider[ed] whether a municipality can be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights." *Id.* at 1154. We held "even if it could be said that Tulsa's policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation." *Id.* at 1155–56.

Under *Trigalet*, there is no question that where the actions of a municipality's officers do not rise to the level of a constitutional violation and the claim against the municipality is based on it serving as the driving force behind those actions, liability cannot lie. But the question here, and in *Garcia*, is different: whether, even where no

40

individual action by a single officer rises to a constitutional violation, a municipality may be held liable where the sum of actions nonetheless violates the plaintiff's constitutional rights. *Garcia* answers that question in the affirmative. And the Supreme Court's subsequent decision in *Heller* does not cast doubt on *Garcia*; in *Heller* the theory of municipality liability was predicated on the actions of one officer who was determined not to have violated the plaintiff's constitutional rights.

Because *Garcia* is not undermined by a subsequent Supreme Court decision, and it also predates *Martinez*, *Garcia* is controlling here. *See Haynes*, 88 F.3d at 900 n.4.

Moreover, assuming the expansion of the *Collins* analysis outside the substantive due process context is appropriate, the reasoning of *Garcia* remains sound. A core principle of *Monell* liability is that municipal entities are liable for only their own actions and not vicariously liable for the actions of their employees. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation. But, as in *Garcia*, sometimes the municipal policy devolves responsibility across multiple officers. In those situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation. Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality

may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

The general rule in *Trigalet* is that there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable. In most cases, this makes the question of whether a municipality is liable dependent on whether a specific municipal officer violated an individual's constitutional rights. But *Garcia* remains as a limited exception where the alleged violation occurred as a result of multiple officials' actions or inactions.

With this legal background in place, we now proceed to the question of whether our resolution of the claims against the individual defendants forecloses the County's liability. We conclude that it does with respect to the failure-to-train claim, but not as to the theory based on a systemic failure of medical policies and procedures. Accordingly, we reverse the district court's denial of summary judgment to the County on the failure-to-train claim, but we lack jurisdiction over the claim against the County based on its allegedly deficient policies and procedures.

### 2.    Dr. LaRowe

Recall that we did not decide whether Dr. LaRowe violated Mr. Crowson's constitutional rights, instead concluding that even if we assume a violation, the right was not clearly established. Leaving the question of a constitutional violation by Dr. LaRowe unresolved does not impact our jurisdiction over the claims against the County on interlocutory appeal because Mr. Crowson's failure-to-train claim respects only the nurses employed at the Jail. Mr. Crowson does not allege the County failed

42

to train Dr. LaRowe. And to the extent Mr. Crowson argues the County's policies constituted deliberate indifference to his rights, that claim does not depend upon an individual employee (or contractor, in Dr. LaRowe's case) having independently violated his rights. Accordingly, neither of the two claims against the County are inextricably intertwined with the claim against Dr. LaRowe.

### 3.    Nurse Johnson

We have concluded Nurse Johnson did not violate Mr. Crowson's constitutional rights. As a result, we have pendent appellate jurisdiction only if we also conclude Mr. Crowson's claims against the County are dependent upon Nurse Johnson violating his constitutional rights.[11] *Id.* Put another way, if Mr. Crowson's claims against the County can succeed despite our holding that Nurse Johnson did not violate his rights, we lack jurisdiction over those claims. *See id.*

The County contends that to succeed on his municipal liability claims, Mr. Crowson must "show an underlying constitutional violation by at least one Washington County employee and that the underlying constitutional violation was directly caused by a county policy." County Br. at 48. But as previously explained, we agree with Mr. Crowson that even if we conclude Nurse Johnson and Dr. LaRowe "did not violate the Constitution individually, . . . their *combined* acts may be

---

[11] We lack jurisdiction to consider the County's attacks on the other elements of either *Monell* claim. *See Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995).

43

sufficient for *Monell* liability" such that Mr. Crowson still has a claim for municipal liability irrespective of whether Nurse Johnson violated his rights. Appellee Br. at 48. In a similar vein, Mr. Crowson argues the claims against the County "depend[] on the actions of policymakers" and their alleged "*systemic* failures" which are distinct "from the claims against the individual defendants." Appellee Br. at 48–49.

Mr. Crowson does assert a failure-to-train claim that, for the reasons discussed above, is dependent upon a predicate violation by Nurse Johnson. This claim is therefore inextricably intertwined with our decision that Nurse Johnson did not violate Mr. Crowson's rights. Accordingly, we exercise jurisdiction over the failure-to-train claim and reverse. But Mr. Crowson also asserts a claim arising out of the County's systemic failure. For the reasons explained above, we lack jurisdiction over this claim.

***

Our conclusion that Nurse Johnson did not violate Mr. Crowson's constitutional rights does not completely resolve Mr. Crowson's claims against the County. The absence of a constitutional violation by Nurse Johnson forecloses Mr. Crowson's failure-to-train claim. However, it does not resolve the broader claim that the County's policy of failing to properly train nurses and guards, combined with its policy of relying on a largely absentee physician, evidenced deliberate indifference to Mr. Crowson's serious medical condition. Because this claim is not inextricably intertwined with the claim against any individual defendant, we lack jurisdiction over it in this interlocutory appeal. We therefore dismiss the County's

44

appeal with respect to the systemic failure claim, and we remand for proceedings consistent with this opinion. In doing so, we express no view as to the merits of this claim. We simply decide we lack jurisdiction to consider it.

## III.    CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of summary judgment to Nurse Johnson and Dr. LaRowe. We **REVERSE** the district court's denial of summary judgment to the County on the failure-to-train theory of liability, **DISMISS** the County's appeal for lack of appellate jurisdiction as to the systemic failure theory, and **REMAND** for further proceedings consistent with this opinion.